All right. Welcome to the Ninth Circuit. Welcome to Seattle, virtually. The case we're about to hear is Sleater v. Benton County. We've got 15 minutes per side. And when you're ready, Counsel. Good morning, Your Honor. May it please the Court. My name is Andrew Biviano on behalf of Ms. Slater and the certified class. I'd like to reserve, if I could, about three minutes for rebuttal. Okay. Okay. Your Honors, the entire purpose of Section 1993, when it was first passed, was to stop people, including governments, from getting third parties to violate the rights of its citizens on its behalf. That's pretty obvious from the title of the Act when it was passed in 1871. It's called the Ku Klux Klan Act. Because of the problem of non-governmental actors carrying out governmentally sanctioned oppression, including, and trying to then escape liability, because you can't actually attribute that to the government. It's also in the text of the statute itself, which says it's illegal for any person, including a government, to, quote, subject or cause to be subjected any citizen to the violation of their rights or privileges or immunity. So it's very clear that it never says that if the person who carried out the act on behalf of another person was not an employee of that county or the city, that therefore the county or city is shielded from liability. And that's the error that the District Court made in its analysis at bottom. It incorrectly concluded, it even says, I'll quote the central error that we see on page 11 of the opinion, and page 11 of the record. Washington law, it said, quote, Washington law makes clear that such a policy could be created only by a superior court judge. Whether others assisted in its creation is inconsequential. The judge then proceeded to analyze this case only under the third prong of Monell liability, which applies only to single isolated acts or decisions of officials or employees, and which looks to statutory authority in those instances to determine whether that single act may expose the municipality to liability. Now, excuse me, can I interrupt? This is Judge Fletcher. The District Court order says under Washington law, this policy could be created only by the judge. Now, if that's true as a matter of Washington law, does that end the case? Or is your argument, well, maybe it shouldn't have been created by somebody else, but in fact it was created by somebody else, that is to say the county? Yes, Your Honor, both those things. Policies maybe can be legally sanctioned only to one party, but other parties can still be assisting in the creation of the policy. So there's several points. Number one, the actions of the judge under that statute still are very relevant to the analysis. And then number two, actions of others are very relevant as well because they can both be assisting in the creation of the policy and they can be ratifying it. This is Judge Rollinson. Don't we first have to determine who the policymaker was for the policy that you're challenging? That's part of it, Your Honor. I don't think it's the first thing we have to do. We have to look at all of the people that were involved in creating this to see if it can be fairly attributed to the county. So, yes, the policymakers in this case were multiple people. The district court clerk, sorry, not the district court clerk, the Brenton County clerk, Ms. Delvin, acknowledged that there's at least four different parties in the room when they were creating this. Well, but we have to determine whether or not those people had the authority to act on behalf of the county, don't we? Actually, no, we don't. Why not? Because that's only if we're looking at the isolated act analysis of Monell, Your Honor. There's four prongs to Monell. The first is whether it's an official policy. The second is whether it's a longstanding practice and custom. And the third, which is the only prong that was dealt with in Propotnick and Edgar and Woods, was when you've got a single isolated act, such as a judge making a decision to not give informed defendants of their rights, and there's no other indicators of anybody being involved, then you look at whether the judge by himself could be a policymaker. What's your theory of this case? In hypotheticals, Your Honor, this is what the case law says. No, I'm not asking you about hypotheticals. I'm asking you what is your theory in this case? In this case, Benton County has acknowledged that the Pay Your Appear program is a policy of Benton County. It's acknowledged this was a longstanding practice or custom that went on for more than a decade, meaning that it has certainly been noticed and ratified and approved by everyone in the county. How is it ratified by the county? Because the people who would be responsible for carrying out the policy, such as the clerk, such as the Office of Public Defense, the people in the prosecutor's office, they were all part of this. But the county can only act through the county commission, correct? No, that's not correct, Your Honor. Unless the person is a policymaker. I think Judge Ginsburg, in her dissent in the McMillian case, made very clear, as well as the majority opinion, that we don't look for having only one policymaker. The lawmaker is not the only policymaker in the county. Anybody who has the ability to take a decision. Well, the dissent doesn't carry the day. Right, but policymaking can be shared among more than one official or body. That's Propotnick and the majority, 485 U.S. at 126. That's not just one body. They come out of the commissioner's office for the county. That's why the analysis of the single decisionmaker applies, because sometimes it's somebody else. It could be the sheriff for certain things. It could be the clerk for other things. It could be the prosecutor for other things. A prosecutor? A prosecutor as a policymaker? Rather than a DA? Well, I'm talking about a county prosecutor who would be the official in that county. It really is about, but again, this is only if we're looking at a single decision. What's been missed in this entire case at the beginning, is if a mayor and a city council get together and decide that they want to save money in their budget by getting rid of public defense for all indigent defendants, and they get a policy that could even be in an open council meeting, could be codified, and then they ask the municipal judge to come in and carry that policy out, saying maybe that it's either your budget or the public defense budget, and the judge exceeds that request and does so, the district court and the defense in this case would say, well, only the judge has the authority to actually do that. So the fact that the mayor and the city council implemented the policy and created it and started the whole thing, and had the judge do it on their behalf, is inconsequential. That's not the case that we have here. Right, but the county would have clearly spoken in that instance, but we don't have that here because the county clerk says it was the judge who implemented the policy. So we don't have those facts that you are articulating. I'm beginning, I think, on the analysis. Scenario two would be whether the judge thought of the idea and thought it would be a good way to save money for his court to not have a defense council. And then he went to the city council and the other people in the city and said, what do you think? And they said, that sounds good to us, let's do it. Again, they are now causing the citizens to be subjected to, they are responsible for this policy. That's very clear in Edgar and Woods, for instance. Why else would this court have looked at whether there was a conspiracy between the city and the judge? Why would the court have looked at whether there was a policy regarding the judge's decisions? And why would the court have looked at any other option? Because those are all relevant to the question. This is Jeff Fletcher. On the facts of this case, what do we know about who formulated it? It seems to me that the county clerk said two different things. In her declaration she says one thing, and in her declaration she says another. Could you focus on the different things the county clerk said and the consequences we might draw from the different things she said? Sure, Your Honor. Again, this is a question of fact for the jury to decide. And when there's a dispute of fact between the two different things said by the clerk, it needs to be resolved by a jury. Right. So which fact is most favorable to you? The most favorable to us is the clerk's initial admission before this briefing happened that this policy was created. This is an admission in the deposition? Yes, it is. Yeah, okay. That this policy was the Benton County Clerk's official policy. It was created not just by her, but by the judges, by the prosecutor, by the Office of Public Defense. The same parties were involved every time the program was modified, et cetera. And then a very critical fact here is that you cannot say that this was exclusively carried out under the judicial authority when the clerk stopped it single-handedly. If this was a judicial act, she couldn't have done that. Not a judicial act, but a judicial policy? Well, a judicial policy, or exclusively judicial policy. This was one in which, and I presented the Killian case to show how under Washington law, clerks serve dual functions of both an officer of the court and as a county official. An officer of the court needs to get a judge's permission to do something, like stop a program like this. But a county official, on her own initiative, on her own statutory authority, said, I'm not doing this anymore, it's unconstitutional. I don't know if I agree with that, because our clerk's office has standing orders that can be entered without the judge physically saying each and every time to issue this order. But can the clerk stop issuing those standing orders without the court's permission? That's the question. No, they can't, because it's a standing order. This is not an order, this is an option. When I read the judge's order, there was a funny grammatical thing that I noticed. It said that if the individual doesn't pay the money or show up for a scheduled hearing, an arrest warrant will be issued. But it doesn't say by whom. That was interesting to me, because if the judge had said the clerk is to issue an arrest warrant, that would be easy. It's the judge's order. And if the judge had said the court will issue an arrest warrant, that would be easy. The clerk is acting without any shelter from the court order. Here it says a court order will be issued, and it doesn't say by whom. So should we read that as just leaving it up to the clerk, the way the clerk said in one of her declarations or depositions that it's up to her, or how should we read it? Absolutely like that, Your Honor. There's another case in which, in every other case, the clerk testified that the judges actually signed the order. If the judge tells the clerk to issue a warrant, she's not responsible. Absolutely. But the clerk had the option to not issue the warrant. She had the option about when to issue the warrant, whether she wanted to give notice first, or a subpoena, or a summons, or a phone call. She had the option to just not do it at all. She said in her deposition, after the public decision that said it was unconstitutional, I stopped doing it. Now I say to the judges, give me a signed order for me to issue a warrant. You're saying she was free to call the person up and say, look, if you don't show up for the hearing, the judge is going to have you arrested and put in jail, and then you can defend your nonpayment. She was free to do that instead of arresting them? Absolutely. She was free to call Ms. Slater in this case and say, hey, it looks like all $75 got attributed to one case number and two of them are in arrears. Are you aware of that? And then fix it. Instead, she went ahead to just issue an arrest warrant that she did not have to issue. That is a really critical fact here. She was not compelled by anyone. She had discretion. And that particular arrest warrant was never run by the judge before it was issued? Correct. The judges approved the form of the warrant years ago, but they were all signed by a deputy clerk. It was absolutely done without any judicial oversight other than the initial setting up of the program. By a deputy county clerk, not a deputy court clerk? Correct, Your Honor. One of Ms. Delvin's employees would just issue the arrest warrant as soon as someone was to link him, without even inquiring as to whether they were indigent or whether it was correct to issue it. I see I have two minutes left. I'd like to reserve more time for rebuttal. And then you've got some time. Okay, great. Thank you. When you're ready, counsel. Okay, thank you, Your Honors. Ken Harper for Benton County. May it please the Court. I think what's critical here is to reassess what this case arose from. This is a case in which a Benton County State Superior Court judge delegated his warrant issuance authority to an elected clerk. In other words, there's no question in this case that what essentially transpired, and I think Judge Kleinfeld had this right, is an allocation of that signature authority and the decision-making that is a necessary part of that signature authority regarding when a warrant should issue for a legal financial obligation payment delegated to the clerk. The clerk then used that discretion, as Judge Kleinfeld's questions, I think, brought out, and I think counsel is quite right, to then make her own decision on when to actually issue the warrant. The Monell issue here, however, is that nothing in that sequence made the clerk a policymaker. There was no state law authority that indicated that she was, therefore, empowered to make Benton County policy on this. To the contrary, the authority to issue state, I'm sorry, the authority to issue legal financial obligation warrants is allocated by state law strictly to the judge. And so that said, yes? Can we back up in time, not to the issuance of particular warrants, but rather to the creation of the pay or appear program in the first place? Who established that program? Okay, very good, Your Honor. There are two points I think that are critical on that. The program is not necessarily the constitutional violation. It's the issuance of the arrest warrant. We know in this case that Benton County continues to have- I'm asking about the program. I'm not asking about the issuance of a particular arrest warrant. All we can say from the record, Your Honor, is that the program was reached by a series of people participating early on, as far back as maybe 2013, maybe in 2006 time period, I think the record suggests, regarding having a system of enforcing legal financial obligations. We don't know specifically who did what. And who was involved in the creation at that time? The record doesn't exactly say, Your Honor. The record indicates that there were a number of people, the judges. The record suggests the prosecuting attorney had something to do with it. The record suggests that- What does Ms. Delvin say in her deposition about how it was established? Your Honor, Ms. Delvin is very vague. I'm trying not to go outside the record. At ER 25, counsel asks, does your office establish policies about collecting LFO obligations? And she says, not only my office, there were others involved. Who else was involved? And she testifies, ER 25, she says, the Superior Court judges and the Benton County Prosecutor's Office, comma, OPD, meaning Office of Public Defense. We don't know beyond that who participated in what formulation of the pay or appear program. And I think that's the critical issue here. It was not the pay or appear program that was unconstitutional under Bearden. That's not what was found unconstitutional in State v. Slater. What was unconstitutional was the issuance of an arrest warrant by the clerk using authority that was allocated solely to the State Superior Court judge without first making the Bearden inquiry. That's an instance of- Counsel, this is Judge Robinson. What is your response to opposing counsel's observation that the clerk stopped issuing the warrants without any further direction from the judge? Well, Your Honor, I think it's twofold. Firstly, she understood that the practice of issuing arrest warrants was found to be unconstitutional by a review in court. A superior tribunal ruled clearly that that practice was unconstitutional. Because she did not have to go to the court to get an order each time an arrest warrant would be issued, she didn't have to go to the court to stop issuing arrest warrants either. That's exactly the reason why this is not an issue where she had delegated authority. What I think needs to be very clear about this, and we're not talking about custom and usage liability here, we're simply talking about the single act issue, what has to be made very clear is that under Pembauer and Proprotnick, the discretion to do an act, to issue an arrest warrant, or to refrain from issuing an arrest warrant, that's not policymaking authority. We see that very clearly in Pembauer where the court states that discretion in the exercise of judicial functions is not sufficient. The official must be responsible for establishing final governmental policy. We don't have anything that suggests that. Proprotnick says, this is at 126, 45 U.S. 126, if the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from responding at superior liability. The best case that- Counsel, I feel like we're off on a frolicking detour on that point, and I think you have conceded, as you would have to concede, that what the clerk was doing was in fact unconstitutional. The thing about 1983 liability that matters here is it does apply to illegal acts. It doesn't just apply to legal acts. Maybe the clerk wasn't allowed to issue arrest warrants under the law. We know that that's so, both under Washington law for what is her authority, and under constitutional law, according to the Washington Court of Appeals decision. Nevertheless, she did it. She was having people arrested and put in jail. It seems to me that so long as that's a policy and practice of the county, it's not just some employee acting contrary to or not under the umbrella of any policy. So long as that's what the county regularly did, I don't see why it matters whether it was lawfully done, and it wasn't discretion of some subordinate employee that the clerk didn't know anything about. It was the clerk. That's why I thought we were off on a frolicking detour there. I don't quite see how you avoid Manel on this theory. Thank you. Welcome back. It's a pleasure to be here, Your Honor. Okay. Do you need a repetition of Judge Kleinfeld's question? No, I think I have it, Your Honors. If I'm correct in understanding, Judge Kleinfeld was asking the issue of whether the unlawfulness of the clerk's action is material to the Manel analysis. And what I would argue, Judge Kleinfeld, is that we're not here to either justify or excuse the clerk's issuance of the Lord Authority, but the inquiry under Manel, under Pembauer, Proprotnick, and the McMillian case, is was she a policymaker of the county for that purpose? Why wouldn't she be like a sheriff? He makes the policy for the sheriff's office, and he tells his deputies, if you see any kind of crime between a black person and a white person, arrest the black person. He has no authority to do that. It's plainly unconstitutional. It's undoubtedly contrary to local law, too. But he does it, and he's the sheriff. Why isn't the clerk in the same position for this business of issuing warrants when she wasn't supposed to, even though it's nowhere near in that league of wrongdoing? Well, because the doing of it or the not doing of it is an issue of whether she had the authority under state law. That's the issue in your hypothetical, Your Honor, regarding whether the sheriff acted. You would certainly find, under Tredino v. Gates or any number of police brutality cases, inquiry into whether or not the municipality was responsible for the sheriff's actions. The sheriff acts in a way that is entirely beyond the authority delegated to him. And I grant you, Your Honor, that sheriffs have broad law enforcement authority. But this is precisely what distinguishes that case from the present, where Ms. Delvin, the Benton County clerk, did not have this authority. And under McMillian, the analysis is made very clear by the majority opinion. You must look to the specific act that is being challenged and determine under state law if that act is, in fact, that of the county. Was it an authorized... But I'm not sure that that really responds to Judge Kleinfeld's point, which is to say, in his example, the sheriff clearly did not have any authority under federal law, under state law, under local law, to implement the policy, if there's a quarrel between a black and a white person, always arrest the black person. He had no authority to do that. Nonetheless, he had set that policy for the sheriffs in the county, and the county would be responsible. So for you to say that the county clerk does not have the legal authority to do that is not a complete answer. Well, I think that's a fair point, Judge Fletcher, and I guess what I would try to draw on is that it isn't the authority to do, it's the authority to make policy. And that's the distinction. If the sheriff has no authority, then the county may or may not still be liable as a municipality. On the other hand, if the sheriff did not have any policymaking authority, in other words, if we don't have a scenario where the sheriff is, in fact, granted that authority by state law, and the sheriff simply usurps that field for himself without anyone at the county having had anything to do with the matter, then the municipality may very well not be liable. I think you're just mistaking it for a matter of law. If the sheriff tells the people in his department to do something that is illegal and he's the county sheriff, the sheriff and the county are on the hook. He is the responsible authority within the county, and he set that policy, illegal as it might have been. I don't think that can follow necessarily at such a general level, Judge Fletcher. I think what the case law teaches is that you have to look at the specific act that's being challenged and whether that specific act was authorized by either state law or some local code provision to be the policy of the county. Otherwise, we have the scenario that without more, the scenario that I think you've identified and that Judge Kleinfeld has identified is simply responding at superior liability. That's where we distinguish our case from, I think, what counsel has argued here. I would like to turn to the issue of the record as well. Counsel suggests that there is evidence here. Back up to that responding at superior. Ordinarily, that's invoked where some county employee is doing something wrong and the county clerk or whoever governs the office didn't authorize it. Here, it's the county clerk herself, the elected official who manages the county. But tell me, municipalities are different in different states. In Alaska, we don't even have counties. We have boroughs, an entirely different form of government. Different states are different. Is there a board of county supervisors that the clerk has to say, or does she really run the office or what under Washington law? Right, right. Judge Kleinfeld, the answer depends on what we're asking about. If the answer has to do, as she testifies in her declaration, if the answer is with respect to when she'll take applications for passports, it's entirely up to her. If the question that we're asking about may have to do with workplace circumstances, conditions of employment, salary, for instance, those sorts of things, then she certainly has to go to the board of county commissioners. And that's precisely the inquiry that I'm arguing for here. We have to analyze what was the source of the Benton County policy. So you're saying there couldn't be a Benton County policy unless the board of commissioners adopted it formally? No, that's one form of Monell liability. I mean, counsel's exactly right. It could be that Ms. Delvin is a final policymaker regarding issuance of warrants, but not simply because she did it and not simply because they were unlawful. It could be that. Well, the not simply because she did it troubles me. I mean, there are all kinds of issues where people say to some organ of government, you can't do that. People say that to policemen sometimes. You can't do that. And the answer is, I'm doing it. And that's basically what happened here. As somebody could say, you can't do that, issue arrest warrants. She's doing it. Well, I disagree that such broad comparisons are going to get us quite what McMillian, at least, is teaching, which is the requirement not to assume that policymaking lies someplace other than where state law puts it. And the policy choice to issue a warrant lies with the trial judge. There's no question about that. On custom and usage, though, I want to make sure that we're clear on this. The fact is this was a judicially sanctioned decision, and that means that even if counsel had better evidence regarding custom and usage under Egger versus City of Livingston, I think this case is on all fours. In terms of a judicially sanctioned system, what do you make of that funny grammar in the judge's order? He doesn't say the county clerk or the clerk of court, who's the county clerk ex officio, shall or issue a warrant. He says a warrant will be issued, leaving it open to issue it. And, Judge Kleinfeld, Judge Fletcher raised, I think, a similar issue regarding the discrepancy, as counsel argues, between the declaration and the deposition. That's right. What I can point you to is Supplemental Excerpt of Record 42, S.E.R. 42, in which Ms. Delvin testified in her deposition, not her declaration here, but in her deposition, she testified that this request and issuance of the warrant was under the direction of the judge. That was the process that the judges wanted us to take. Counsel says you mean under the direction of the judge that the judge approved the form in advance for your office to fill out and issue upon your discretion. Testimony from Ms. Delvin was the form and the process, okay, and the process being what? When people failed to pay, we would issue a warrant. That's the testimony from the deposition. That's not different from the testimony in her declaration. And what that indicates is that the judges created the process that she then implemented. Just as in Livingston, the judge created the process of 229 people actually failing to have their rights read to them before they were incarcerated, or in Leadbetter v. City of Topeka, where the clerk was issuing warrants on a rubber stamp, very comparable in that Tenth Circuit case of Leadbetter to what we have here. And in each situation, the issue is where did the unconstitutional policy arise, and was that a policy of the county? Got it, okay. You're over time, so unless there are further questions, No, no, it's not your fault at all. We took you on. Thank you. Rebuttal. Finishing the rest of the Egger case. Yes, it was very clear that the act in question was a judicial policy that by itself could not give the city liability, but this court took pains after that to analyze all the other avenues. It did not stop at the single act analysis. It analyzed whether there was a relationship between the judge's act and a policy of the city or county. I'm more interested in what happened in this case than in the underlying case law, because we can read that. Sure. I'm interested in what's the best evidence you have. I understand it's disputed, so I'm asking for the best evidence on your side that, in fact, the county clerk, Ms. Delvin, created the policy or created the program. Your Honor, the best evidence comes from the fact that, first of all, it was a 10-year program. Ms. Delvin came into office in 2006, I believe, and made the choice that she was going to continue doing what was the practice and custom of the office. Over the years, she was part of the process to modify the program. She talked about how over the years, not just her, but she worked with the judges and the prosecutor and the defense to see what changes they had to make. And then she acknowledged that it was the policy of her office. It wasn't just the judge's policy that she followed. She said it was the policy of the Benton County Clerk's Office to do this program. And then, under her authority, she stopped it when she realized that it was not constitutional. Those are facts that a reasonable jury could certainly conclude made her have concurrent authority along with the judges, which is similar to the Duval case, in which there was no question it was a judicial act made in court that was to act in question. But this court found that, yes, but there was also an ADA coordinator who could have been a factor in this decision, and there was also a city policy or county policy that was part of the reasoning for the judge. So it doesn't stop right there. She's like the ADA coordinator, and the county is like the county here. It's critical to understand that the incentives to violate the Constitution are immense for any city or county. You can save millions of dollars and time and look tough on crime, and this Supreme Court has always held that Section 1983 liability is the only deterrent. It's crucial to stop counties from doing this. If there's no downside to violating the Constitution, how will it have any effect? And as Glenn said, this applies to both legal and illegal actions. It does not matter if the county clerk was breaking the law or the sheriff, as is what they say. That can't be the case. If it's the case, then the district court in Benton County have provided a perfect roadmap for how a city or county can violate the Constitution with impunity, and that's not what Section 1983 is meant to do. Okay, thank you. Unless there are further questions from the bench? No. Thank you very much. That's the case. We've heard good arguments on both sides. The case is now submitted for decision. Thank you, Your Honor. You're welcome. Back home from Seattle to your homes. Thank you. Thank you, Judge. Thank you.
judges: Kleinfeld, W. Fletcher, Rawlinson